# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

GARY TYRE, individually; SAMANTHA
JACOBS as Administrator of the Estate of
JERROD WEBSTER TYRE; and YVONNE
GILDER, individually,

        Plaintiffs,

        v.

ROBERT L. BRANTLEY, JR.; and JOHN
DOES 1–3,[1]

        Defendant.

CIVIL ACTION NO.: 2:16-cv-110

## O R D E R

Presently before the Court is Defendant Robert L. Brantley's Motion for Summary

Judgment. (Doc. 34.) This 42 U.S.C. § 1983 action arises from Defendant Brantley's use of

deadly force during a standoff that resulted in the death of Jerrod Tyre ("Tyre"). (Doc. 1.)

Plaintiffs Gary Tyre and Samantha Jacobs filed this lawsuit for damages on July 15, 2016. (Doc.

1.) Gary Tyre is Tyre's father and Samantha Jacobs is the administrator of Tyre's estate. (Id.)

---

[1] While "John Does 1–3" are listed as defendants in the Amended Complaint, Plaintiffs have not identified
or served process upon any additional persons. (Doc. 12.) It is well-settled that service of process is "the
vehicle by which the court obtains jurisdiction." U.S. S.E.C. v. Carrillo, 115 F.3d 1540, 1543 (11th Cir.
1997). "[A]n action may proceed against a party whose name is unknown if the complaint makes
allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery."
Estate of Rosenberg by Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995). After ascertaining the
identity of a "John Doe" defendant, however, a plaintiff must amend the operative complaint and effect
service of process. Because the "John Doe" defendants in this case have not been named or served, they
have not been brought before the authority of the Court and the Court cannot grant summary judgment in
their favor. Rather, the proper course at this late stage of the litigation is to dismiss the claims against them.
See James v. Mazda Motor Corp., 222 F.3d 1323, 1324 n.6 (11th Cir. 2000) (citing Fed. R. Civ. P. 4(m))
(construing district court's grant of summary judgment to dismiss claims against John Doe because plaintiff
failed to name or serve anyone within the time period proscribed by Rule 4). Accordingly, the Court
**DISMISSES** Plaintiffs' claims against John Does 1–3. The Clerk of Court is directed to **TERMINATE**
these fictious individuals as defendants on the docket of this case.

After Yvonne Gilder—Tyre's mother—filed a Motion for Joinder, (doc. 9), Plaintiffs filed an Amended Complaint and named Ms. Gilder as an additional plaintiff, (doc. 12). Plaintiffs assert claims against Defendant pursuant to 42 U.S.C. § 1983, alleging that Defendant Brantley violated Tyre's Fourth and Fourteenth Amendment rights. (Id. at pp. 3–4.) Plaintiffs also seek to recover attorney's fees under 42 U.S.C. § 1988. (Id. at pp. 5–8.)

Defendant subsequently filed the at-issue Motion for Summary Judgment and argues that Plaintiffs' Fourth Amendment claim lacks the necessary evidentiary support and/or is barred by principles of immunity.[2] (Docs. 34, 35.) Plaintiffs filed a Response in opposition, (docs. 41, 42, 43), and Defendant filed a Reply, (doc. 45). For the following reasons, the Court finds that Defendant is entitled to judgment as a matter of law on all claims asserted against him in this lawsuit and, therefore, **GRANTS** Defendant's Motion for Summary Judgment, (doc. 34). The Court **DIRECTS** the Clerk of Court to enter the appropriate judgment of dismissal and to **CLOSE** this case.

## BACKGROUND

The following facts are relevant to the disposition of Defendant Brantley's Motion and are undisputed.

The events giving rise to this action occurred on July 21, 2015, when the Wayne County Sheriff's Department dispatched officers to Tyre's residence. (Doc. 43, p. 9.) The responding officers found Tyre in his yard holding a pistol. (See id., pp. 11, 19–21.) Tyre refused to drop his

---

[2] In his Motion, Defendant requests that the Court enter summary judgment "in his favor on all claims." (Doc. 34, p. 1.) However, Defendant does not specifically address the Fourteenth Amendment claim in his Motion nor do Plaintiffs mention it in their Response. Nonetheless, as detailed below, the Fourteenth Amendment does not apply to the facts of this case and, therefore, Plaintiff cannot recover on that claim. Thus, the Court enters judgment on all claims including those asserted under the Fourteenth Amendment.

gun, and a standoff ensued.  (Id.)  Defendant arrived at the scene roughly twenty minutes after the

conflict began, and the standoff ended with Defendant shooting Tyre.  (See id., pp. 11, 19–21.)[3]

The pertinent details from before and during Defendant's involvement will be discussed in turn.

## I.    Events Occurring Prior to Defendant Brantley's Arrival

On July 21, 2015, Tyre's fiancée called "911" to report an incident of domestic abuse.

(Doc. 34-2, p. 1).  Officers were dispatched at 7:56 p.m. and told to proceed to 114 Briar Branch

Road in Jesup, Georgia—Tyre's address.[4]  (Id. at pp. 1, 10, 16.)  At approximately 8:07 p.m.,

Deputy Kornegay ("Kornegay") and Deputy Manning ("Manning") encountered Tyre's fiancée

down the street from Tyre's home.  (Id. at pp. 2, 10.)  The deputies spoke with his fiancée for

several minutes and arrived at his property around 8:14 p.m.  (Id.)  Deputy Sloan ("Sloan") pulled

into the driveway first, followed by Kornegay and Manning.  (Doc. 35-2, pp. 23–24, 27; Kornegay

DCR at 07:57–08:23.)[5]  When the officers arrived, Tyre was standing in front of his driveway in

a large grassy area and was holding a gun in his right hand.  (Kornegay DCR at 08:00–08:23;

Figure 1.)  Kornegay remained in his vehicle and immediately instructed Tyre to put his gun down

---

[3] The entire altercation was captured by Deputy Kornegay's and Deputy Sloan's Dash Camera Recordings (hereinafter "Kornegay DCR" and "Sloan DCR," respectively).  (Doc. 35-2, Ex. B (Kornegay DCR); doc. 43, Ex. 5 (Kornegay DCR); doc. 35-2, Ex. C (Sloan DCR).)  Additional footage was captured by Officer Boyles' Body Camera Recording (hereinafter "Boyles BCR"), and Deputy Bradt's Helmet Camera Recording (hereinafter "Bradt HCR"), though Boyles and Bradt arrived at Tyre's address later than Deputies Kornegay, Manning, and Sloan.  (Doc. 43, Ex. 7 (Boyles BCR); doc. 43, Ex. 8 (Bradt HCR); doc. 35-2, Ex. D (Bradt HCR).)  The parties submitted and frequently cited the footage from these videos.  The Court has thoroughly reviewed the footage and relies upon it as much as possible.  For purposes of clarity and conciseness, the Court will omit docket number citations and only refer to the videos by the shorthand labels indicated above.  Additionally, because the videos do not contain timestamps, the Court will cite to the run time reflected on the media player, also known as a time code.

[4] Any references to a specific time of day were derived from the parties' briefs and supporting evidence. The Court stresses that these times are approximations based on the record and are provided for contextual purposes only.

[5] The four videos vary drastically in terms of vantage points and captured audio.  As such, the Court often cites to multiple videos to support a single proposition.

while Tyre began to yell at the officers.  (Kornegay DCR at 08:20–08:41.)  Tyre did not comply, and Kornegay once again urged him to drop his weapon.  (<u>Id.</u>)  As Tyre continued to shout, Manning and Sloan positioned themselves behind the driver's-side doors of their respective vehicles.  (<u>Id.</u> at 08:41–10:57; doc. 35-2, pp. 25–27.)  Both officers had guns pointed in Tyre's direction; Manning had an M16 rifle and Sloan had his service pistol, a "Glock .40."  (Doc. 35-2, pp. 25–27.)



Figure 1: Configuration of Sloan, Kornegay, and Manning's Vehicles and Tyre's Location (Kornegay DCR at 08:24.)

At 8:16 p.m., one of the three officers informed "dispatch" that they were engaged in a standoff with an armed man.  (Doc. 34-2, p. 16.)  Manning updated dispatch at 8:18 p.m., explaining that Tyre still had the gun but had not pointed it at the officers.  (<u>Id.</u>; Kornegay DCR at 10:57–10:59.)  Manning also requested that the Sheriff's Response Team ("SRT"), a group of specially trained officers that provide tactical support, be activated.  (Doc. 35-2, p. 30; <u>see</u> doc. 43, p. 31.)  Accordingly, dispatch first contacted Sergeant Robertson ("Robertson"), who was the SRT team leader at the time.  (Doc. 35-2, p. 35; doc. 51, p. 47.)  Dispatch then called four other SRT

officers, including Deputy Bradt ("Bradt"), Deputy Hendricks ("Hendricks"), and Defendant Brantley. (Doc. 34-2, pp. 4, 16.) Hendricks was instructed to pick up the department's "less lethal" weapons. (Doc. 43, p. 4.) Defendant received his call from dispatch at 8:21 p.m. (Id.)

Meanwhile, the standoff between Tyre and the officers persisted; the officers continued to ask Tyre to drop his gun while Tyre continued to pace and yell. (See, e.g., Kornegay DCR at 10:59–32:00.) At some point before 8:20 p.m., the Wayne County Sheriff's Department requested assistance from the Jesup Police Department. (Doc. 43, p. 22; Boyles BCR at 00:00–00:26.) Officer Boyles ("Boyles") responded and pulled into Tyre's driveway around 8:21 p.m. (Doc. 43, p. 22; doc. 34-2, p. 11.) Boyles parked his car further down the driveway, behind and to the left of Kornegay's truck, and walked toward the other officers. (Boyles BCR at 02:39–02:41, 3:27.)

At some point within the next 12 minutes, two more officers arrived at the scene, and Manning repositioned himself behind his truck. (Id. through 15:27.) One of the two additional officers, Corporal Evors ("Evors"), joined Manning at the back of the truck, and both he and Manning had M16's pointed at Tyre. (See, e.g., id. at 15:27, 16:58; doc. 43, p. 22; Figure 2.) Deputy Bradt ("Bradt"), a member of the SRT, arrived at approximately 8:36 p.m. (Doc. 43, p. 22.) Bradt parked his truck at the end of the driveway, angled toward Tyre's position in the grass. (Bradt HCR at 00:00–00:10; Figure 3.) Bradt prepped his rifle and stood behind his truck until Defendant Brantley pulled up about a minute and a half later, at approximately 8:37 or 8:38 p.m. (Bradt HCR at 00:10-1:36; see doc. 34-2, p. 11; doc. 43, p. 7.)



Figure 2: Vehicle and Officer Positions (Boyles BCR, at 15:27.)



Figure 3: View of all Vehicles and Tyre (Bradt HCR at 00:00.)

## II.    Events Occurring After Defendant Brantley's Arrival

As noted above, dispatch called Defendant around 8:21 p.m. and informed him that the SRT had been activated.  (Doc. 34-2, pp. 4, 16.)  Defendant was told that "the shift [] on duty was in a stand-off with a man with a gun . . . [who was] refusing to put it down."  (Id.; doc. 43, p. 16.) When Defendant arrived on scene approximately 16 minutes later, around 8:37 p.m., Tyre continued to yell various expletives at the officers from the grass.  (Bradt HCR at 00:10-1:36; see doc. 34-2, p. 11.)  Defendant prepared his M16, talked briefly with Bradt, and walked up the driveway toward the other officers.   (Bradt HCR at 02:18–02:42.)   Defendant stood behind Kornegay's passenger-side door, immediately to the left of Manning and Evors, and all three officers had M16's pointed at Tyre.  (Id.; Boyles BCR at 18:56–19:01; Figure 4.)  At this point, Sloan stood in front of them with his Glock .40.  (See, e.g., id.; Kornegay DCR at 32:06; Figure 5.)



Figure 4: Defendant's position in relation to other officers.  Defendant is on the far right.  (Boyles BCR, at 19:01.)

A few seconds later, Tyre yelled, "Get the f*** out of here," and raised his voice even louder to shout, "Get the f*** out my yard!" (Boyles BCR at 19:06–19:07; Kornegay DCR at 32:07–32:09; Bradt HCR at 2:55–2:58; Sloan DCR at 28:43–28:46.) Sloan responded, "It ain't that easy, man," to which Tyre said, "It is that easy! I'mma walk around there with a loaded gun and start slapping a motherf***er." (Sloan DCR at 28:47–28:53; Kornegay DCR at 32:14–32:17.) Tyre then pointed at Kornegay with his empty hand and said, "You! [inaudible expletives] You think I'm scared of you? I ain't scared of you," while he walked towards Kornegay's truck with his arms out wide and his pistol in his right hand. (Kornegay DCR at 32:17–25.) After Tyre took eight steps forward, an officer said, "Stop sir." (Id. at 32:22–32:25; Figure 5.) Tyre then took three more steps, and the officer again told him to "stop." (Id.)



Figure 5: Tyre walking toward the officers (Kornegay DCR at 32:22.)

Tyre stopped and continued to yell for the next forty-five seconds, during which time he asked, "Somebody gonna pop me? Y'all get out here and get with it," referenced his ".22," and stated that he had "a right to bear arms." (Id. at 32:25–33:10; Sloan DCR at 29:24–29:27

(mentioning his .22).)  A few seconds later, Defendant began to speak to Tyre and asked, "What's your name, sir?"  (Boyles BCR at 20:12; doc. 35-1, p. 70.)  Tyre first said "it d[idn]'t matter" what his name was, but eventually stated that his name was Jerrod Tyre.  (Boyles BCR at 20:13–20:29; Kornegay DCR at 33:17–33:35.)  During this time, one of the officers called dispatch and requested that an EMS truck be ready at the end of the road.  (Boyles BCR at 20:22.)  Tyre yelled for another forty or so seconds, once again stating that he was not afraid of the officers and that he wanted them to leave.  (Kornegay DCR at 33:35–34:17.)

At this point, Defendant and Tyre had a forty-five second exchange that ended when Defendant shot Tyre:

- Defendant: "Listen man, we wanna talk to ya."  (Boyles BCR at 21:17–21:18.)

- Tyre: "No! I'm done talking to y'all, I've told y'all to get the f*** out of my yard. Enough!"  (Kornegay DCR at 34:19–34:23; Bradt HCR at 5:09–5:12; Sloan BCR at 30:56–31:00.)

- Defendant: "Why don't you put the weapon down so we can talk to you?"  (Kornegay DCR at 34:28–34:30; Boyles BCR at 21:26–21:28.)

- Tyre: "If I talk to you, you're gonna lock me up regardless of what [expletives] I do with my weapon."  (Bradt HCR at 5:19–5:23; Kornegay DCR at 34:32–34:34.)

- Defendant: "What started all of this?"  (Boyles BCR at 21:39–21:40.)

- Tyre responded and said something about seeing the officers on the road, then said, "I'm an arrogant mother***er if you didn't know."  (Bradt HCR at 5:36–44; Sloan DCR 31:27–31:33.)

- Tyre took his first step toward the officers.  (Kornegay DCR at 34:59; Figure 6.)

- After Tyre took five steps, Defendant said, "Step back!"  (Id. at 35:02; Boyles BCR at 22:01; Figure 7.)

- Tyre took seven more steps forward, shook his head slightly, and said "no" while Defendant yelled, "Step back, step back!"  (Kornegay DCR at 35:-2–35:05; Boyles BCR at 22:02–22:03; Figure 8.)

- At approximately 8:41 p.m., Defendant fired four shots and Tyre fell to the ground.  (Kornegay DCR at 35:05–35:06.)



Figure 6: Tyre's position as he began to walk forward (Kornegay DCR at 34:59.)



Figure 7: Tyre's position when Defendant gave first warning to "step back" (Kornegay DCR at 35:02.)



Figure 8: Tyre's position during second and third "step back," one second before Defendant fired the first shot (Kornegay DCR at 35:04.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). When the nonmoving party would have the burden of proof at trial, the moving party may

discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (emphasis and citations omitted).  Further, in cases where video footage is provided, the Court must "view[] the facts in the light depicted by the videotape."  Id., at 380–381.  The video will prevail over a nonmovant's allegations where the footage "obviously contradicts the nonmovant's version of the facts."  Shaw v. City of Selma, 884 F.3d 1093, 1098 (11th Cir. 2018).

## DISCUSSION

Plaintiffs collectively assert claims against Defendant in his individual capacity pursuant to 42 U.S.C. § 1983 for the use of excessive force, arguing that his conduct violated both the Fourth and Fourteenth Amendments.  (Doc. 12.)  Plaintiffs also contend they are entitled to attorney's fees pursuant to 42 U.S.C. § 1988.  (Id.)  In his Motion for Summary Judgment, Defendant argues

that Plaintiffs' Fourth Amendment Section 1983 claim fails on the merits because the undisputed facts show that he did not violate Tyre's constitutional rights. (Doc. 34.) Defendant alternatively argues that he is entitled to qualified immunity because Plaintiffs have not shown—and cannot show—that his actions violated clearly established law. (Id. at pp. 15–18.) Plaintiffs, however, contend that summary judgment should not be entered in Defendant's favor on either theory. The Court will address the parties' arguments below.

## I.     Section 1983: Use of Excessive Force under the Fourteenth Amendment

Plaintiffs' Amended Complaint alleges that Defendant's purported use of excessive force "shocks the conscience," amounting to a violation of Tyre's substantive due process rights under the Fourteenth Amendment. (Doc. 12, pp. 3–4.) This claim fails as a matter of law. In Graham v. Connor, the Supreme Court held that all excessive force claims arising from a "*seizure* of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard rather than under a substantive due process approach." 490 U.S. 386, 395 (1989) (emphasis added) (internal quotation marks omitted). This holding did not preclude Fourteenth Amendment substantive due process claims of excessive force in "those instances in which a free citizen is denied his or her constitutional right to life through means *other than* a law enforcement official's arrest, investigatory stop or other seizure." Wilson v. Northcutt, 987 F.2d 719, 722 (11th Cir. 1993) (emphasis added). Here, Plaintiffs seek damages arising from the lethal shooting of Tyre, and "apprehension by the use of deadly force [constitutes] a seizure" for purposes of the Fourth Amendment. See Tennessee v. Garner, 471 U.S. 1, 7 (1985). Because Plaintiffs' claim arises from the use of excessive force during a "seizure," the claim must be analyzed under the Fourth Amendment rather than the Fourteenth Amendment substantive due process clause. Accordingly,

Plaintiffs cannot recover based on a theory that Tyre's Fourteenth Amendment rights were violated.

## II. Section 1983: Use of Excessive Force under the Fourth Amendment

Plaintiffs also seek to hold Defendant liable pursuant to 42 U.S.C. § 1983 for the use of excessive force in violation of Tyre's clearly established Fourth Amendment rights.[6] (Doc. 12, pp. 4–5.) Defendant, however, argues that he is entitled to judgment in his favor because the undisputed evidence shows that the use of deadly force was objectively reasonable under the circumstances. (Doc. 34-1, p. 2.) Specifically, Defendant points to: Tyre's refusal to drop his weapon for over thirty minutes; his angry and aggressive demeanor; his threats to harm the officers with his weapon; and his advance toward the armed officers despite warnings to stop. (Id. at pp. 9–15.)

### A. Legal Authority

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This guarantee includes the "plain right to be free from the use of excessive force" in the course of an arrest, investigatory stop, or any other seizure. Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002). As such, "all claims that law enforcement officers have used excessive force" are subject to "the Fourth Amendment and its 'reasonableness' standard." Graham, 490 U.S. at 395.

---

[6] On the last page of their Response, Plaintiffs also state that Tyre "had a clearly established constitutional right to exercise his Second Amendment rights on his own property without being shot dead." (Doc. 41, p. 20.) Plaintiffs do not mention the Second Amendment, much less assert a theory of recovery thereupon, in their Amended Complaint. (Doc. 12.) To the extent Plaintiffs seek to assert a Section 1983 claim for violation of the Second Amendment, "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314–15 (11th Cir. 2004); see also Fisher v. Metro. Life Ins. Co., 895 F.2d 1073, 1078 (5th Cir. 1990) (allegation of improper benefits calculation not raised in second amended complaint but in response to summary judgment motion is not properly before court). Accordingly, the Court will not address this issue.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013) (quoting Graham, 490 U.S. at 396)).

In doing so, courts must ask whether the force applied was "objectively reasonable in light of the facts confronting the officer." Crenshaw v. Lister, 556 F.3d 1283, 1290 (11th Cir. 2009) (per curiam). Reasonableness in this context "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," Graham, 490 U.S. at 396. This "calculus . . . must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97. Courts "must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." Crosby v. Monroe County, 394 F.3d 1328, 1334 (11th Cir. 2004). Indeed, "[t]he operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" Hammett v. Paulding County, 875 F.3d 1036, 1048 (11th Cir. 2017) (quoting Garner, 471 U.S. at 8–9). In conducting this inquiry, courts are to consider several factors, including: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. See Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009).

Notably, however, more recent Eleventh Circuit Court of Appeals opinions have relied solely on the second factor—the presence of an immediate threat to an officer's safety—to justify an officer's use of deadly force.  See Shaw v. City of Selma, 884 F.3d 1093, 1099 (11th Cir. 2018) (decisive factor is threat of physical harm that the decedent posed at the time he was shot); Hammett, 875 F.3d at 1048 (deadly force "constitutionally permissible" where officer "use[d] such force to dispel a threat of serious physical harm to either the officer or others"); Perez v. Suszczynski, 809 F.3d 1213, 1220 (11th Cir. 2016) (objective reasonableness depends on whether suspect poses serious threat, with emphasis "on the level and immediacy" thereof); Penley v. Eslinger, 605 F.3d 843, 851 (11th Cir. 2010) ("In this case, the reasonableness analysis turns on the second of these factors: presence of an imminent threat."); Shaw v. City of Selma, 241 F. Supp. 3d 1253, 1271 (S.D. Ala. 2017) ("Recently, the Eleventh Circuit concluded that, even when the first and third factors are absent, the presence of the second factor—whether the suspect poses an immediate threat—may justify entry of summary judgment for the officer on an excessive force claim.") (citing cases), aff'd, 884 F.3d 1093 (11th Cir. 2018).  These cases make clear that "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm . . . use of deadly force does not violate the Constitution."  Penley, 605 F.3d at 851.  Thus, the constitutionality of Defendant Brantley's actions hinges on "whether, given the circumstances, the suspect would have appeared to reasonable police officers to have been gravely dangerous."  See id.

## B.     Analysis

In his Motion, Defendant argues that Tyre "posed a risk of immediate harm sufficient to justify the use of deadly force as he stood stationary in the grass," and that this risk was amplified when Tyre advanced toward the officers.  (Doc. 34-1 at p. 14.)  Specifically, Defendant notes that

he observed Tyre angrily and "repeatedly disobeying orders to drop his gun, heard him say that the gun was loaded, and . . . heard him threaten to do bodily harm to the officers with the gun." (Id.) Considering this behavior, Defendant argues it was reasonable to believe deadly force was necessary to prevent Tyre from harming any of the officers when he "advanced" on them with his gun "despite being given multiple clear orders to halt." (Id. at pp. 11–12.) Plaintiffs, on the other hand, maintain that Tyre's undisputed conduct was not threatening enough to warrant the use of deadly force. (Doc. 41, pp. 10–14.) Plaintiffs further argue that Tyre's verbal threats during the four or so minutes after Defendant's arrival were just that—verbal—and "did not pose an immediate threat" to Defendant or any other officer. (Id.)

As noted above, the Court "must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." Crosby, 394 F.3d at 1334. Here, the undisputed facts show that Defendant's actions were objectively reasonable. Defendant responded to a call and pulled up to a scene replete with law enforcement vehicles and officers in defensive positions—all focused on Tyre, who was armed, openly hostile, and uncooperative. From the moment that Defendant arrived at the standoff, Tyre had his pistol in his right hand and expressed his discontent with the situation through a stream of profanity and other aggressive language, including a threat to "walk around there with a loaded gun and start slapping a mother***er." (Sloan DCR at 28:47–28:53.) He also repeatedly referenced his loaded weapon, told the officers he was not afraid of them, and mentioned his "right to bear arms." (Id.; Kornegay DCR at 32:17–25.) After a few short exchanges with Defendant, Tyre ignored Defendant's request that he put his weapon down, expressed that he was done talking, and began walking toward Defendant and the other officers. (See id. at 32:17–59.) Tyre was directly in front of Kornegay's

truck when Defendant first warned him to "step back," but Tyre said "no" and continued to walk forward.  (Id. at 35:02–35:08; Figure 7.)  Defendant then issued two more warnings prior to discharging his weapon.  (Doc. 34-2, p. 4, 16.)  Considering the totality of the circumstances, an objective officer in Defendant's position could have reasonably believed that Tyre posed an immediate threat to the safety of Defendant and the other officers on the scene.  See McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1246 (11th Cir. 2003) (officer's use of deadly force was constitutionally reasonable because the officer could reasonably believe that the suspect posed "an imminent threat of violence to the officer" when the suspect ignored the officer's commands and approached the officer with a stick held above his head).

Plaintiffs offer two arguments in opposition to such a finding, neither of which are availing.  First, Plaintiffs contend that it was unreasonable for Defendant to believe that he was in danger because Tyre never pointed his pistol at the officers.  (Doc. 41, p. 10–11.)  Common sense and controlling case law entirely thwart this argument.  While Hollywood may fictitiously depict Doc Holliday waiting for Johnny Ringo to draw first in the oak grove at the mouth of Silver Springs Canyon,[7] the reality is that once an armed suspect has pointed a weapon at an officer or someone else, it is too late for the officer to prevent the suspect from shooting his target.  Thus, unsurprisingly, the Eleventh Circuit has consistently held that "where orders to drop [a] weapon have gone unheeded, an officer is not required to wait until an armed [suspect] has drawn a bead on the officer or others before using deadly force."  Garczynski v. Bradshaw, 573 F.3d 1158 (11th Cir. 2009).

For example, the court in Shaw v. City of Selma held that an officer did not use excessive force in shooting an armed and hostile suspect when the suspect began to approach him.  884 F.3d

---

[7] Kilmer, Val and Michael Bien. Tombstone. Directed by George P. Cosmatos. Burbank, California: Buena Vista Pictures, 1993.

1093. The suspect was carrying a hatchet, had ignored "more than two dozen" warnings to drop

his weapon, and, at the time he was shot, was "within a few feet" of the officer. Id. at 1100. Even

though the hatchet was not raised at the time of the shooting, the suspect "could have raised [it] in

another second or two and struck [the officer] with it." Id. Under such circumstances, "a

reasonable officer could have believed that [the suspect] posed a threat of serious physical injury

or death." Id.; see also Wilson v. Parker, 746 F. App'x 860, 864 (11th Cir. 2018) (per curiam)

(reasonable to use deadly force where suspect refused commands to show hands and charged at

officer with large stick at his side); Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law

does not require officers in a tense and dangerous situation to wait until the moment a suspect uses

a deadly weapon to act to stop the suspect."); Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th

Cir. 2010) ("Regardless of whether Jean-Baptiste had drawn his gun, [the] gun was available for

ready use, and Gutierrez was not required to wait and hope for the best.") (citation and internal

marks omitted).

The undisputed facts of this case demonstrate that Defendant faced an even greater and

more immediate threat to his and the other officer's safety than that presented in Shaw. Tyre was

visibly agitated, openly held his loaded gun in his right hand, and repeatedly refused to put it down.

Further, the video footage establishes that Tyre was also within a few feet of Defendant at the time

Defendant shot him and that Defendant had to make a split-second decision between shooting Tyre

or waiting to see what Tyre did as he continued to get closer to the officers. (Kornegay DCR at

35:02–35:08; Figure 7.) Under such circumstances, "a police officer needn't risk his life on the

chance that the advancing suspect has or will suddenly develop peaceful intentions." Williams v.

Deal, 659 F. App'x 580, 602 (11th Cir. 2016) (per curiam); see Davis v. Edwards, No. 18-11695,

2019 WL 3814435, at *4 (11th Cir. Aug. 14, 2019) (per curiam) ("Edwards was in a precarious

position that necessitated an immediate decision. He was not required to wait any longer before using deadly force.").

Plaintiffs' second argument similarly lacks legal support. Plaintiffs assert that Defendant acted unreasonably when he set up his weapon prior to the arrival of "less-lethal" means. (See Doc. 41, pp. 13–14.) However, this argument would require the Court to look at the facts in terms of what Defendant "could have" done. It is well-established that, in excessive force cases, the reasonableness of an officer's actions must be considered without "the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "[I]n the context of cases involving allegations of excessive force, after-the-fact '[r]econsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred.'" Varnadore v. Merritt, No. 18-14568, 2019 WL 3429136, at *5 (11th Cir. July 30, 2019) (quoting Carr v. Tatangelo, 338 F.3d 1259, 1270 (11th Cir. 2003)). Here, Defendant, a member of the specially-trained SRT, arrived and saw an active standoff between several officers and an angry, armed man. While he could have waited for Hendricks to arrive with the less-lethal options, he instead chose to assist his fellow officers in the ongoing and undisputedly tense conflict. Plaintiffs have not pointed to any legal authority showing that this choice was unreasonable under the circumstances, and it is not the Court's duty to "second-guess the decisions made by police officers in the field." Vaughan v. Cox, 343 F.3d 1323, 1331 (11th Cir. 2003); see Menuel v. City of Atlanta, 25 F.3d 990, 996–97 (11th Cir. 1994) (citation omitted) ("Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer.").

Based on the foregoing, the Court finds there to be no genuine dispute of material fact as to whether Defendant's actions were objectively reasonable under the circumstances. While Mr.

Tyre's death is a tragedy, the evidence shows that he held a gun in his right hand, expressly stated that the gun was loaded, threatened to harm the officers, and disregarded instructions to both drop the gun and stop moving toward the officers. An objective officer in Defendant's situation could have reasonably believed that Tyre posed an immediate threat to the officers' safety and that deadly force was necessary to avoid the risk of serious injury. Said differently, "video evidence of the shooting and the surrounding circumstances makes it clear that no reasonable jury could find that [Brantley] lacked an objectively reasonable basis for using deadly force against [Tyre] under the circumstances of this tragic case." <u>Varnadore</u>, 2019 WL 3429136, at *1. As such, Defendant did not violate Tyre's Fourth Amendment right to be free from excessive force and is entitled to judgment in his favor on Plaintiffs' Section 1983 claim against him. <u>See</u> <u>Williams</u>, 659 F. App'x at 602 (defendant entitled to summary judgment where plaintiff did not show violation of Fourth Amendment). Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment on this issue.

III.     **Attorney's Fees**

Plaintiffs also request attorney's fees and expenses of litigation under 42 U.S.C. § 1988. (Doc. 12, p. 7.) A claim for attorney's fees under federal law requires Plaintiffs to have a viable underlying claim. <u>See</u> 42 U.S.C. § 1988(b) (providing that the court may allow "the prevailing party, other than the United States, a reasonable attorney's fee"). Because their substantive claims against Defendant do not survive summary judgment, Plaintiffs cannot be considered "prevailing part[ies]" and therefore their claim for attorney's fees also fails. Accordingly, the Court **GRANTS** summary judgment in favor of Defendant on this issue.

## IV.     Qualified Immunity

For the reasons explained throughout this Order, the Court finds that Defendant is entitled to judgment in his favor on the merits of Plaintiffs' excessive force claim.  In the absence of any viable claims, the Court need not address the issues of qualified immunity.  See Williams, 659 F. App'x at 581 ("We conclude that the police officer didn't violate the Fourth Amendment at all. Because of this conclusion, we needn't engage in a full-blown qualified immunity analysis . . . ."); Haberle v. Univ. of Ala. in Birmingham, 803 F.2d 1536, 1541 n.3 (11th Cir. 1986) (qualified immunity analysis unnecessary where case was decided on the merits); Barker v. Norman, 651 F.2d 1107, 1124 (5th Cir. 1981) ("[I]f the defendant has established beyond dispute that he did not engage in the complained-of conduct, then summary judgment is appropriate.  [This] has nothing to do with the qualified immunity defense; rather, it is based on the plaintiff's inability to prove the facts essential to recovery . . . .").[8]  However, even if a genuine dispute of material fact existed as to the merits of Plaintiffs' claims, Defendant would nonetheless be entitled to summary judgment on the principle of qualified immunity.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  "Qualified immunity is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."  Hoyt v. Cooks, 672 F.3d 972,

---

[8]  In Bonner v. City of Prichard, 661 F. 2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

977 (11th Cir. 2012) (quotations and citations omitted). As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery." Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks omitted). But qualified immunity does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)) (internal quotation marks and alteration omitted).

To rely upon qualified immunity, a defendant first must show that he or she acted within his or her discretionary authority. Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1352 (11th Cir. 2015). Specifically, a defendant must show that he or she "was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). Here, Plaintiffs do not contest this issue, and it appears that Defendant, a deputy sheriff and member of the SRT, was acting within his discretionary authority when he responded to an active standoff.

Once a defendant establishes that he was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). The Court must grant qualified immunity unless Plaintiffs can show (1) that there was a violation of the Constitution; and (2) that the illegality of the Defendant's actions was clearly established at the time of the incident. Hoyt, 672 F.3d at 977. The Court has discretion in deciding which of those two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). In this case, Plaintiffs have not made either

showing. The Court has already determined that even when viewing the evidence in the light most favorable to Plaintiffs, Defendant did not commit a constitutional violation. However, even if the facts could somehow establish that Defendant used excessive force in violation of the Fourth Amendment, it cannot be said that the illegality of his conduct was clearly known at the time of the incident underlying this lawsuit.

"[T]he touchstone of qualified immunity is notice." <u>Bussey-Morice v. Gomez</u>, 587 F. App'x 621, 627 (11th Cir. 2014) (per curiam) (citing <u>Holmes</u>, 321 F.3d at 1078). The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right. <u>See</u> <u>Coffin v. Brandau</u>, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc). Under the Eleventh Circuit's framework for applying this step of the qualified immunity analysis, a plaintiff must show that the allegedly violated right was "clearly established" in one of three ways. First, the plaintiff may point to caselaw with indistinguishable facts decided by the Supreme Court of the United States, the Eleventh Circuit Court of Appeals, or the highest court of the pertinent state that clearly establishes the constitutional right. <u>Long</u>, 508 F.3d at 584. Second, a broad statement of principle from "a federal constitutional or statutory provision or earlier case law" can provide notice that certain conduct amounts to a constitutional violation where the principle "applie[s] with 'obvious clarity' to the circumstances, establishing clearly the unlawfulness of the Defendant['s] conduct." <u>Id.</u> Finally, the plaintiff may show that the alleged conduct of the officials was "so egregious that a constitutional right was clearly violated, even in the total absence of case law." <u>Lewis</u>, 561 F.3d at 1292.

Here, Plaintiffs have failed to meet this burden. Plaintiffs do not cite any controlling or materially indistinguishable case law and do not identify "a broad legal principle" indicating that an officer's use of deadly force in response to a perceived imminent threat of bodily harm from a

hostile and armed citizen amounts to a constitutional violation.  See Griffin Indus. v. Irvin, 496 F.3d 1189, 1209 (11th Cir. 2007).  The Court's own research has likewise revealed none.  Indeed, as explained above, controlling case law establishes that Defendant's actions were entirely reasonable given the undisputed circumstances surrounding his use of force.  Finally, Plaintiffs have not shown that Defendant's conduct was "so egregious as to violate . . . the Fourth Amendment on its face."  Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002).  Thus, Plaintiffs are unable to show that Defendant's actions violated clearly established law.  Accordingly, even if Plaintiffs demonstrated facts amounting to a constitutional violation, Defendant is insulated from liability for violations of federal law.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant Robert L. Brantley, Jr.'s Motion for Summary Judgment, (doc. 34).  Additionally, the Court **DISMISSES** Plaintiffs' claims against John Does 1–3.  The Court **DIRECTS** the Clerk of Court to enter the appropriate judgment of dismissal and to **CLOSE** this case.

**SO ORDERED**, this 19th day of September, 2019.

_____

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA